Anthony L. NUGEY, Appellant,

v.

OLIVER MANUFACTURING SUPPLY CO., a Corporation of New Jersey, and Mamie Pellegrino, Executrix of the Estate of Patsy Pellegrino.

No. 13727.

United States Court of Appeals
Third Circuit.

Argued Oct. 1, 1962.

Decided June 19, 1963.

Rehearing Denied Aug. 5, 1963.

Abraham J. Nydick, New York City, for appellant.

Louis D. Fletcher, New York City (Orlando H. Dey, Rahway, N. J., Darby & Darby, New York City, on the brief), for defendants-appellees.

Before STALEY and FORMAN, Circuit Judges, and LANE, District Judge.

LANE, District Judge.

Plaintiff, Anthony L. Nugey, instituted this action against defendants, Oliver Manufacturing Supply Company and Patsy Pellegrino, alleging infringement of United States Patent 2,575,462, which describes an apparatus for curing building blocks. Defendants raised the defenses of invalidity and non-infringement. Claim of invalidity was based upon want of invention over prior art and non-infringement upon a license that plaintiff had granted defendants and defendants' shop rights therein. Jurisdiction is founded upon 28 U.S.C. § 1338.

This appeal is from the district court's determination of invalidity based upon a finding that the prior art is replete with anticipation of the various claims of the patent in suit.

During the period 1938–1953, defendant Pellegrino had engaged in the manufacture of cinder and cement building blocks in Rahway, New Jersey, and thereafter in Port Reading. Both plants were under the ownership of defendant Oliver Manufacturing Supply Company, a corporation of the State of New Jersey, in which Pellegrino was president and principal stockholder.

Building blocks are molded to form and size from batches of material consisting primarily of water mixtures of sand, cement, and cinders. The blocks are cured by subjection to a hydration process followed by carbonation. Normal curing process involves presetting the molded blocks for a period of two-and-a-half hours, then slowly raising the temperature over a two-hour period to approximately 190° F. The blocks are then subjected to a hydration process for five hours at this temperature, after which the blocks are dried out to a prescribed moisture content. Because hydration is not completed in the five-hour period, the process must be continued for a much longer period before the block develops full strength. This is usually accomplished by storing the blocks in the open air for from two to four weeks, with carbonation taking place at a slow rate. While carbonation would be most effective if started after the blocks are completely hydrated, this cannot be accomplished because hydration continues for a long period of time with the development of more and more strength. The carbon dioxide absorbed during carbonation under normal conditions comes from the atmosphere.

Throughout the years efforts had been made to devise means and methods for speeding the curing of synthetic building materials and reducing the cost of production. The use of high early strength cement to effect a quicker setting in the block and of calcium chloride to dry the water out faster were common methods and were used by defendants long before plaintiff Nugey joined them in 1945. Plaintiff was a consulting engineer and, although without prior experience in the building block industry, he interested himself in an attempt to devise apparatus and discover chemicals that would enable defendants to develop a quicker and more economic curing process.

At plaintiff Nugey's direction, defendants' manufacturing process was revised so as to feature three separate but coordinated phases:

1. A reaction unit consisting of a heater of sufficient capacity for discharging the products of combustion

into a curing chamber and to maintain the optimum temperature for curing.

2. A recirculating or duct system to accomplish (a) circulation of the products of combustion from the reaction unit to the curing chamber and back to the reaction unit; (b) exhaustion of the super-saturated air from the curing chamber and admission of fresh air at the same time; (c) regulation of the temperature, moisture and carbon dioxide content of the air passing through the curing chamber.

3. A balanced conveyor system for the purpose of moving blocks through and removing them from the chamber after the optimum curing period.

On February 9, 1947, plaintiff Nugey's assignee, Dri-Fast Process Corporation, filed suit in the New Jersey Chancery Court against Oliver and Pellegrino, alleging that Nugey had, on or about September 26, 1945, granted defendant Pellegrino the exclusive right to use secret processes Nugey had developed, and defendant had failed to pay the agreed royalties for such use. On February 16, 1949, Nugey made application for a patent for an apparatus for curing building block. Shortly thereafter, on October 18, 1949, the state court litigation was terminated by entry of consent judgment in which was incorporated by reference an agreement entered into by the parties on October 15, 1949, wherein Nugey and assignee granted to defendants Pellegrino and Oliver a license for the use of the process Nugey had purportedly conceived in September 1945. On November 20, 1951, the Patent Office granted to Nugey the patent now in suit.

The Nugey patent consists essentially of a continuous serpentine kiln composed of parallel straight sections joined by circular sections at their ends, such that the two open ends of the kiln are at the same end of the apparatus and relatively close to each other. The blocks to be cured are transported through the kiln by a conveyor. The conveyor consists of straight sections within each straight section of the kiln, and separate curved sections within the curved sections of the kiln so that the blocks move on a continuous path through the kiln.[1] The conveyor receives the blocks to be cured directly from the block-forming press. The apparatus is designed so there is a continuous flow of blocks through the kiln at a speed equal to that of the output of the block-forming press. At the outlet end of the kiln the blocks are unloaded from the trays which carried them through the kiln and the empty trays are transported by the conveyor back to the forming press for reloading.

The blocks are cured by hot gases being passed over them. These hot gases are generated by combustion and are circulated by a fan so that the flow of the gases through the kiln is in a direction opposite that of the movement of the blocks. The patent specifications disclose the products of combustion entering at the outlet end of the kiln, and being withdrawn from the kiln at the inlet end. The patent apparatus has a provision for either discharging the gases to the air or recirculating them through the combustion equipment and back again through the kiln. The patent also provides for introducing fresh air into the combustion equipment either alone or in a mixture with the gases exhausted from the kiln.

The basic design of subject patent is clearly anticipated by Lang, patent 1,663,309 (1928), wherein there is disclosed a serpentine kiln with parallel straight sections joined by curved sections. Lang provides for a continuous conveyer within the kiln, said conveyor receiving the bricks to be treated from an automatic brick-forming machine, carrying them through the kiln and discharging them at the exit of the kiln, with the conveyor returning to the brick-forming machine to receive more bricks to be

1. While it might seem logical to use a continuous one-piece conveyor, the Patent Office disallowed such a claim as being anticipated by the prior art.

treated. Both Lang and the subject patent employ the feature of a kiln taking the continuous output of a machine forming the products to be treated. Lang also employs the use of products of combustion to treat the products being cured and the patent suggests the use of a counter current of the gases.

Subject patent contains several features not found in the Lang patent. These are:

1. Use of a counter current of the gases by introducing them into the outlet end of the kiln and withdrawing them from the inlet end of the kiln.

2. Use of a system of valves whereby the air entering the reaction unit can be varied between use of outside air, use of the gas withdrawn from the kiln, or a combination of the two.

3. Use of a blower to circulate the gases throughout the unit.

4. Use of a separate reaction unit to generate the products of combustion used to cure the blocks.

5. Use of a sectionalized rather than a continuous conveyor, although the function of both conveyors is the same.

Four of these elements are found present in other patents granted prior to the one in suit.

I. The use of a counter current flow of gas is found in several patents, including Nimmo patent 444,153 (1891) which discloses a kiln for baking and burning crucibles in which there is a single continuous conveyor moving the objects in a counter current to the flow of the products of combustion. The Lang patent also suggests the use of a counter current, but this does not take place throughout the whole unit, while the Harrison patent 1,916,949 (1933) shows the use of a conveyor with a current of carbon dioxide in continuous circulation and counter to the flow of the material being treated.

II. Colbert patent 1,697,556 (1929) describes an apparatus for drying ceramic ware. Through a system of ducts, air is heated in a furnace, then passes through a fan which pushes it through the ducts to the drying tunnel. There is a provision at the fan for mixing outside air with the air heated by the furnace. Upon exiting from the tunnel, the heated air travels through another system of ducts controlled by dampers. By proper adjustment of the dampers, the heated air may be recirculated through the fan or exhausted into the atmosphere. Gehnrich patent 1,961,143 (1934) provides for an oven which is heated by convection. The heating unit is next to the oven and the air which is heated is circulated by a fan from the heating unit, through the oven, and back again through the heater.

III. The use of a blower to circulate the gas is found in the Colbert 1,697,556 (1929) and Gehnrich 1,961,143 (1934) patents.

IV. Several patents disclose a separate reaction unit, including Gehnrich 1,961,143 (1934) and Colbert 1,697,556 (1929).

V. As to a sectionalized conveyor, the fifth element not present in Lang, examination of the Pauley patent 965,003 (1910) discloses the use of a sectionalized conveyor, although no provision is made for continuous flow through the kiln. Indeed, we find no patent, in those cited to us, which does disclose a sectionalized conveyor providing a continuous flow. There is, however, no contention made that the sectionalized conveyor is a unique feature of subject patent, and it is a matter of common knowledge that conveyors of very many types and descriptions have had long-term usage in manufacturing processes. Finally, as the manufacturing apparatus that had been used by defendants employed a continuous conveyor, there could be no basis for a finding of infringement as to this element.

■■ We are in agreement with the court below that the invention in suit contains nothing new, that it is nothing more than an aggregation of elements to be found in the prior art, and that there

is no element of inventive genius involved in combining these parts.

"It remains the law that the 'mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention'. Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008. Compare the similar language in Richards v. Chase Elevator Co., 1895, 159 U.S. 477, 487, 16 S.Ct. 53, 40 L.Ed. 225." Alco Kar Kurb, Inc. v. Ager, 286 F.2d 931, 932–933 (3d Cir. 1961).

"More must be done than to utilize the skill of the art in bringing old tools into new combinations." Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 89, 62 S.Ct. 37, 39, 86 L.Ed. 58 (1941).

See also the recent opinion of this court in Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3d Cir. 1962).

■■ We should dispose of one more claim plaintiff advanced at trial to the effect that the patent apparatus is unique in that it involves a sequential hydration and carbonation, in that hydration is substantially completed before carbonation

is commenced.[2] We find no merit in this contention. There is no claim in the patent for such a feature. "It is well settled that the claims in a patent are the measure of the patentee's rights." L. S. Donaldson v. La Maur, Inc., 299 F.2d 412, 417 (8th Cir. 1962). See Davies-Young Soap Co. v. Nu-Pro Manufacturing Co., 273 F.2d 454 (8th Cir. 1959). "However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than any other unpatented device." Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 684, 64 S.Ct. 278, 280, 88 L.Ed. 396 (1944).

We find therefore Nugey is not entitled to any protection on his assertion of sequential hydration and carbonation.

A further reason for rejecting the claim of sequential hydration and carbonation is that there has been no reduction to practice. Plaintiff has testified that he never constructed the apparatus described in the patent; and that his sole tests were performed on a two-inch cube in a laboratory apparatus, in which he blew the gases over the cube rather than moving the cube through the gases. Clearly, this experiment would not be sufficient to validate the claim, if, in fact, it had been set out in the patent. See Elmore v. Schmitt, 278 F.2d 510, 512–513 (C.C.P.A. 1960).

The judgment will be affirmed.

2. The appellant's brief contains the following description of this process:

"The green blocks containing water move through the sinuous kiln. The temperature of the kiln is high. The prevailing high temperature accelerates hydration. It is clear, therefore, that as the moist green blocks move through the long sinuous path under the prevailing high temperature that the anhydrous cement undergoes hydration so that they are fully hydrated as they approach the outlet end thereof.

"The reaction products from the reaction unit (primarily carbon dioxide) en-

ter the kiln at the point where the fully hydrated blocks are about to emerge from the kiln. Accordingly, the fully hydrated blocks meet the vapors from the reaction unit where those vapors contain their maximum content of carbon dioxide. As those vapors are propelled in their loop through the kiln, the carbon dioxide content thereof diminishes in consequence of the absorption by the hydrated blocks of carbon dioxide with which they come into contact during the movement of the gases through the kiln." Appellant's brief at 8–9.