Joseph P. RUTH, an individual, Plaintiff,

v.

BLUE RIVER CONSTRUCTORS, An Unincorporated Association, et al., co-members comprising the unincorporated association Blue River Constructors, and the City and County of Denver, Acting by and through its Board of Water Commissioners, Defendants.

CITY AND COUNTY OF DENVER, A Municipal Corporation of the State of Colorado, Acting by and through its Board of Water Commissioners, Third-Party Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY and the Aetna Casualty and Surety Company, Third-Party Defendants.

Civ. A. No. 6679.

United States District Court
D. Colorado.

Oct. 17, 1963.

Edward O. Geer, Bruce Ownbey, and David G. Manter, Denver, Colo., for plaintiff.

E. E. Donnelly, Jr., John C. Oberlin, and Don D. Jeffery, Cleveland, Ohio, for defendant Blue River Constructors.

Eugene P. Helfer, Denver, Colo., for third-party plaintiff City and County of Denver.

Charles D. Bromley, Denver, Colo., for third-party defendants.

CHRISTENSEN, District Judge.

This is a suit for infringement of U. S. Letters Patent No. 2,611,680 entitled "Exhaust Gas Conditioning Method", which issued September 23, 1952, to the plaintiff, Joseph P. Ruth, upon an application filed January 16, 1950.

The case was tried to the Court without a jury April 15 to 20, 1963 and has been submitted for decision upon written briefs. Involved in addition to the issue of infringement are the usual questions of invention, novelty and utility with reference to a patent covering an air "scrubber" or "conditioner" designed to remove toxic gases from and to cool diesel engine exhaust, so as to make more feasible the employment of such engines in underground mining or construction operations.

The plaintiff, Joseph P. Ruth, is a resident of Denver, Colorado, and is the owner of Patent No. 2,611,680 in suit. The defendant, Blue River Constructors, is an unincorporated association in the nature of a joint venture which was organized for the sole purpose of constructing the Roberts Tunnel in the State of Colorado, having as its members Mid-Valley Utility Constructors, Inc., a Delaware corporation; S. A. Healy Company, an Ohio corporation; Charles H. Tompkins Company, a District of Columbia corporation; J. A. Jones Construction Company, a Delaware corporation; A. S. Horner Construction Company, a Colorado corporation; and Colorado Constructors, Inc., also a Colorado corporation. These members are also separately named as defendants. The City and County of Denver is a Municipal Corporation of Colorado. Denver, acting in its proprietary capacity, through its Board of Water Commissioners, had authority to enter into the contract for the construction of the water diversion tunnel known as the Roberts Tunnel. This contract provided for the services of The Blue River Constructors as independent contractors.

The Court has jurisdiction over the subject matter of this action and the parties hereto. In matters relating to the contract above mentioned, the place of business of the Blue River Constructors was within the District of Colorado. This was the regular and established

place of business of the several members of such joint venture in reference to their activities in performing the construction contract. They were served with process in this suit at such place of business through agents in charge. The objection of the defendant contractors to service of process upon them was not well taken.

The patent in suit more particularly relates to a method of conditioning internal combustion engine exhaust gases by directing them through a liquid body, thereby agitating the latter to form a gas-liquid mixture, and passing this mixture through an alkaline diffusing medium, such as limestone, insoluble in the liquid body and soluble in the gas-liquid mixture, to eliminate or reduce acidic constituents, the exhaust gases thereafter being emitted from the conditioner. It is claimed that the toxic acid in the exhaust is thereby converted to non-toxic salt. The alkaline medium, by neutralizing the acid gas as fast as it hydrolyzes, assertedly keeps the water in a condition to avidly absorb the acid constituents from the engine exhaust. Manifestly a conditioner effective for this purpose would be a boon to underground operations where work utilizing diesel engines has been hampered by noxious odors and gases as well as by excessive heat.

The claims of the patent are six in number. While they are repetitious in several respects their differentiating elements appear to be these: (a) the introduction of exhaust gases into a liquid body; (b) association with an intersticed alkaline medium insoluble in water but soluble in the gas-liquid mixture; (c) the agitation of the liquid body to form a gas liquid mixture; (d) repetitious washing of the gas-liquid mixture through the intersticed alkaline medium; (e) the collection in the liquid body of the drip condensate from the agitation and washing, and (f) the liberation of the undissolved gases.

Claim 1 will serve as an illustration:

"1. The method of conditioning internal combustion engine exhaust gases to non-hazardous and unob- noxious form free from entrained solids and acidic constituents which consists of introducing the gases under the influence of their discharge pressures into the lower portion of a liquid body associated with and disposed to wet the surfaces of an intersticed alkaline diffusing medium insoluble in the liquid of the body and soluble in the characteristic acidity of the gas-liquid mixture, agitating said liquid body in reaction to the gas input flow to dissolve the soluble gas constituents in the liquid and to wash the resulting gas-liquid mixture through the interstices of the diffusing medium with neutralizing effect on the acidity of the gases, collecting the condensate resulting from such agitation in the liquid body, and liberating the undissolved gases."

The plaintiff charges that without license or consent from him air conditioners infringing his patent were used on diesel engines in the construction of the Roberts Tunnel by the defendants. I find that the accused devices as operated by the defendant joint venturers contained elements or functions of the patent in suit and that each of the claims of the patent in suit reads directly on the accused devices utilized by the joint venturers. If valid, there would be no question but that the patent in suit was infringed by the accused devices of the defendant joint venturers. The extent of that infringement or the damages, if any, occasioned thereby need not now be determined.

The plaintiff has failed to sustain his allegations that the City and County of Denver infringed or induced infringement of the patent in question in any manner. This defendant did sell to the other defendants certain diesel equipment with "Ruth conditioners" but these were under license from Ruth. The assertion that liability could be predicated upon a lawful sale to the other defendants because the City and County of Denver thereby made possible or "induced" infringing use of similar devices by the

other defendants is not supported by the facts and is too tenuous an inference or theory to justify further comment. As a consequence of this determination we need not consider the third party claim of the City and County of Denver against the insurance companies.

Prior public use of limestone in water conditioners on diesel locomotives was established, with such uses extending from late 1941 through 1949, first by Stiers Bros. and thereafter Tunnel Constructors, in separate tunnel excavations in Colorado. The testimony with respect to such uses was not clear and precise concerning the arrangement of baffles and trays although the witnesses were numerically impressive. It was further established that the use of limestone in a water bath through which exhaust fumes were discharged was well known and practiced in the art long prior to the Colorado experiences. With his long study and investigation of conditioning apparatuses in this country and abroad and his prior unsuccessful applications for the patenting of air conditioners beginning as early as 1938, it is improbable that Ruth was unaware of this prior art.

The proof of the prior art, prior publications and these established prior public uses had established the use in such conditioners of various dispositions of lime rock; thus, the lime rock was placed on a tray entirely submerged in the water bath, on a tray partially submerged in the bath, or on a tray entirely above the bath.

The Ruth patent is not distinguishable from the prior art as shown by the prior patents and prior publications of record. The very early Liebrecht German Patents, together with the Schantz German Patent, which were not cited in the patent office, teach the usefulness of an alkaline reagent material in association with a liquid body through which the exhaust gases from internal combustion engines pass, one example given being a diesel mine locomotive.

Liebrecht German patent 232,843 discloses the use of perforated trays within the water bath compartment carrying lumps of reagent material through which the exhaust gases must pass to escape through the perforated top of the container, and German patent 233,699 is cross-referenced to German patent 232,-843 and further explains the same. As stated at page 3 of the stipulated translation of German Patent No. 232,843 the "gases pass through the reagent layer $D$ in a fine dispersion, and here lose the volatile injurious combustion residue by chemical affinity". While such reagent is thus not explicitly identified as being alkaline in character, Dr. Gary testified that it would obviously be such in order that it might chemically combine with the acidic constituents of the exhaust gases. Reference may be had also to the subsequent Schantz German patent 480,859 which clearly refers to the two prior German patents, and notes that alkaline reagents such as lime are employed for the purpose of removing acid elements of the exhaust gases.

The exhaust gases are introduced into the conditioner of Liebrecht patent 232,-843 in such manner as to violently agitate the water bath so that "the cooling liquid must share in the upward deflection of the exhaust gases", and the second patent, 232,699, makes it clear that the reagent layer D of the first patent is directly contacted and thus certainly washed by the gas-liquid mixture.

Various prior publications, identified as Exhibits, independently disclosed a diesel locomotive exhaust conditioner containing water and a diffusing medium in the form of slag wool. Dr. Gary testified that such slag wool would be ordinarily alkaline. One of the publications concerning this type of conditioner showed the basket with the diffusing medium only partially submerged in the water.

Ruth now claims that by his arrangement of limestone above the liquid bath so as to be repetitively washed by the gas-liquid mixture (which originally he hit upon with the object only of reducing corrosion of the metal tank) he discovered an unexpected result in terms of purification of the air. There is little

to suggest that the arrangement itself was the reason for the claimed favorable result except perhaps in increased efficiency. As a matter of fact, the model conditioner, the operation of which the court inspected, involved such violent agitation that the limestone seemed less suspended above the water than emersed.

According to plaintiff's own testimony, corroborated by his article in *The Mines Magazine*, it was old to use a water conditioner wherein the exhaust gas is introduced into the body of water and the resulting gas-liquid mixture carried upwardly through a layer of rock, for example, "Swedish pebbles". Thus in November, 1939, Ruth wrote:

> "Diesel mine locomotives were first used in German mines where an inflammable gas existed. In order to drop the temperature of the Diesel engine exhaust to a point where it would not ignite the gases, the exhaust was discharged into a large box filled with rocks, having a reservoir for water at the bottom and a centrifugal pump for pumping water to the top of the box so that it would spread over all of the surfaces of the rocks contained therein. The hot gases from the engine coming up through the interstices of the rocks and the heat being dissipated by changing the water from a liquid to a gas, and as we all know, the latent heat of evaporation of one pound of water is 960 BTU's. Quite a considerable amount of heat could be dissipated with a very small amount of water."

Ruth used for several years a conditioner involving most of the elements of his present one but without, as he indicates, the key to it * * * limestone. He testified that the alleged novel method originated with the placement of limestone in one of his old conditioners which had become badly corroded in use, in an effort to neutralize the acidity of the water. He subsequently theorized that this modification would eliminate the acidic constituents from the exhaust gases passing through such bath. This the-ory of operation appears in every claim of the patent and a study of the file history shows that statements to such effect were essential to allowance of the claims.

Ruth explained the critical point of his invention as follows in a letter dated January 5, 1961:

> "After several successful months of the water scrubber at Idarado, I decided to put one on the Horse Creek locomotive, and sold one to Great Western Sugar Company for $475.00.
>
> "The conditioners worked fine, except at Horse Creek they changed the conditioner water only once a week, and after several months I was vehemently notified by Jim Dudgeon that the $475 conditioner was all eaten up and you could stick your finger through it anywhere. From pH tests, I found the water to have a pH of 3.5, which is strong acid; after putting in limestone, it became 6.5, almost neutral. I patched the conditioner and loaded it with course limestone in such a way that the exhaust gas water mixture passed over, around, and through the limestone in the conditioner, and after several months I saw that the limestone had destroyed the acid action. This was in 1949, and that conditioner with limestone is still in operation on No. 1 locomotive; the limestone neutralizes the nitric acid. They have 4 of my locomotives now.
>
> "I filed for a patent, and when the examiner said he was going to give me a final rejection because limestone was substantially insoluble in water and no chemical action could take place, I went to Horse Creek, got some samples of limestone that were half eaten up, and took them to Washington and showed them to the patent examiner. After he had looked at the acid-eroded chunk of limestone in his hand for several minutes, he said: 'I see. Limestone is insoluble in water, but it is soluble in the exhaust gas water mix-

ture.' My patent attorney used his words in the claims he prepared to cover my invention. * * * "

At the trial plaintiff described the essence, and final acceptance, of his revised claims as follows:

"So, they had the young lady take me back into a little room where this Examiner was. I went in and gave him—talked to him first, and told him I understood he was going to give me a final rejection the next time in the event I didn't show him there was some action on it, and I said, 'Here is the piece of limestone. I tell you frankly, I don't know how it works, or what it does, but I do know the diesel exhaust when it comes out is different from what it was when it goes in.' He takes it over and I show him the water and he turns it over and over in his hand and he thinks a few minutes and says, 'I see. It is insoluble in water but soluble in gas-water constituents, mixture.' I saw in those few words he had distinguished my invention from all other patents he had cited, so I remember those words absolutely and I bring it back to Mr. Sweet and tell him about it and he draws up the claims which the Examiner finally allowed, which distinguished from all the other inventions that he had cited. Those rejections you see there, when he made that change in there distinguished from those rejections."

It seems quite apparent that the heart of his present claims was the use of limestone and perhaps its location above the gas agitated liquid bath. From the foregoing description and from plaintiff's testimony it also seems fair to infer that the limestone neutralized the acidity of the water of the old conditioner at least to a substantial degree without reference to any special interposition of the limestone or related baffling. He arrived at the theory that the conditioner, thus modified, was now capable of effectively removing acid-

ic constituents, notably oxides of nitrogen, from the exhaust gases, and filed a patent application containing both apparatus and method claims. The apparatus claims were abandoned but the patent eventually issued on the method as heretofore described.

The most pertinent prior art patents and publications relied on by defendants were not cited by the examiner during the prosecution of the Ruth patent in suit, nor does it seem that the examiner was aware of the prior public uses proved by the defendants. In another jurisdiction it has been adjudged that the Ruth patent was valid. However, in that case the court apparently was not apprised of pertinent prior art and of prior public uses established here, and since infringement there was not adjudged, the validity of the patent was not so sharply at issue as here.

The evidence of any scientific basis for the contention that the use of an alkaline diffusing medium employed with a liquid body in the manner shown in the patent will remove to a superior degree the acidic constituents from internal combustion engine exhaust gases appears equivocal. There was evidence from a chemical engineer, Dr. Gary, tending to establish that the removal of such constituents can be better accomplished with a chemically inert, rather than an alkaline, diffusing medium such as limestone. The tests upon which the conclusion of defendants' expert was based, however, were over a short period of time and involved old equipment the efficiency of which was in question. Dr. Gary, was asked what he understood the Ruth patent in suit to teach regarding the removal of acidic constituents. He replied, "nothing". It was not until the question was rephrased to ask him, "what does the patent *purport* to teach with regard to the removal of acidic constituents?" that he replied, "that by using an alkaline medium, a higher percentage of the acidic constituents would be removed". Dr. Gary then further indicated that this was not true in fact and that in the context of the

patent it was not according to accepted chemical theory.

As against such testimony, however, there remains the practical circumstance that the industry did accept the utility of the new Ruth conditioner, as did the defendants who utilized its teaching in the accused devices. Under such circumstances it does not lie with the defendants to question utility, especially in view of the presumptions supporting the validity of the patent. I conclude that the patent in suit was effective to some extent for the purposes for which it was designed, obtained substantial acceptance in the industry and thus possessed practical utility.

But the issue of invention presents a more difficult problem. Internal combustion engine exhaust gas conditioners have long been employed with many minor variations. Their principal functions have been to cool the exhaust gases, extinguish sparks, dissolve the odorous aldehydes, and collect a portion of the oil and soot. Conventionally, a liquid bath has been employed for these purposes with the gases also being passed through some sort of mechanical filter or baffle arrangement such as baffle plates, wire mesh, flint pebbles, or the like, to remove entrained liquid or for other purposes. In some cases intersticed media such as pebbles, metal turnings, slag wool, lime, and limestone within the bath have been employed, all prior to the alleged invention covered by the patent in suit. Limestone, among other things, was used in conditioners by others in tunnel work in Colorado years before Ruth's claimed invention in an effort to reduce the toxidity of the gas, according to the testimony of Henry Eckes, his son and others. This effort involved the complete emersion of the limestone in the water and also the disposition of the water below the top of the limestone. One Putman testified to the use of a lime-water solution in the water bath, which was also sprayed over the rising gas fumes by means of a pump. This was on another underground project about ten years before Ruth's patent.

The situation of limestone above the bath so that agitation of the water underneath would repetitiously wash the limestone seems under the evidence to involve substantially the same kind of chemical or other reaction as that already known to the art, perhaps differing only in efficiency. But even if this were not so, the disposition of the limestone in a tray above the water as in the Ruth patent so that the violent agitation of the water would bathe the limestone was a modification that did not involve invention. It was one that a person skilled in the art could have been expected to devise.

It had been long understood that internal combustion engine exhaust gases contained certain noxious ingredients, such as carbon monoxide. In the case of diesel exhausts the evidence indicates a recognition for many years that other acidic constituents, including oxides of nitrogen, were also a serious problem. Alkaline media have been regularly employed in industry to neutralize acids, as in large towers to "scrub" gases of acid constituents; and exhaust conditioners also used alkaline reagents (lime, slag wool, limestone) to treat the engine exhaust gases in hope of achieving similar effects at least to a degree, despite the rapidity with which the exhaust was required to pass through the relatively small devices that were feasible for attachment to movable equipment.

It was old in the art to introduce exhaust gases into a liquid body. It was old in the art to bubble gas through liquid to absorb some of its components and thereupon to pass the gas through baffles, rocks or other material to remove entrained liquid from the gas. It was old in the art to use limestone in a water bath in connection with exhaust conditioners. It was old in the art to suspend in or over the liquid by baffles or plates lime paste or stone through which the gas would pass from the water bath. It was old in the art to violently agitate the water bath by the action of the gas as it moved through the liquid. It was old in the art to achieve at least some.

degree of repetitious washing of an alkaline medium by gas-agitation of the liquid body. It was old in the art to collect drip condensate in a liquid body. The idea of the patent examiner after an initial rejection of the original claims of plaintiff's application was that the invention arose from the unexpected result of the combination—an application of the concept that limestone was insoluble in water but soluble in the gas-liquid mixture. But this seemed to be a concept implicit in the prior art, or at best a characterization rather than an invention. The particular arrangement of the elements in the Ruth patent is not shown to have involved any substantial change, and the result achieved marked only a difference in degree of effectiveness.

It must be recognized that Ruth was a pioneer, and almost an evangelist, in gathering together the best ideas for the conditioning of engine exhaust in underground operations and in preaching the necessity of proper safety precautions underground. As such he is entitled to respect and admiration which the court freely extends. But this cannot substitute for the lacking element of invention to support his patent.

I conclude as follows:

The court has jurisdiction over the subject matter of this action and of all of the parties.

■ In the absence of clear and convincing evidence to the contrary it is to be presumed that a patent has been validly issued. Admiral Corporation v. Zenith Radio Corporation, 10th Cir., 296 F.2d 708 (1961), and Mott Corporation v. Sunflower Industries, Inc., 10th Cir., 314 F.2d 872 (1963). This, however, is not an irrebuttable presumption and is at least thrown into question by failure to cite relevant and important prior art before the Patent Office. Admiral Corporation v. Zenith Radio Corporation, supra. See Fritz W. Glitsch & Sons, Inc. v. Wyatt Metal & Boiler Works, 5th Cir., 224 F.2d 331 (1955). And when upon the whole record, lack of invention appears

by clear and convincing evidence the patent may not be sustained. Admiral Corporation v. Zenith Radio Corporation, supra.

■ While the fact that a patent has been sustained in another case involving different parties should be accorded weight, the force of such an adjudication is lessened by incompleteness of the prior art before that court and the fact that the question of validity may have been less directly involved. In any event it is the responsibility of this court to determine whether the presumption of validity has been overcome by the evidence received before it.

It is clear that there was nothing in Ruth's device which was not anticipated in the prior art, with the possible exception of recognition of the utility of using limestone instead of other reagents in washing with the water bath or the applied concept that limestone is insoluble in water but is soluble in the gas-water mixture. This in final analysis seems to involve a rather narrow question of whether recognition of the significance of results achieved or the identification or specification of principles of operation comprises invention.

■ A new combination of old elements whereby a new and useful result is obtained or whereby an old result is obtained in a more facile, economical and efficient way is patentable provided the discovery and reduction to practice of the novel combination require greater skill and higher thought than would be expected of the ordinary expert trained in the art. Williams Iron Works Co. v. Hughes Tool Co., 10th Cir., 109 F.2d 500 (1940).

■■ It is not necessary that a patentee should understand scientific principles underlying his discovery so long as he makes a sufficient disclosure to enable other persons skilled in the art to practice the invention. Application of Libby, 255 F.2d 412, 45 CCPA 944 (1958). But more than a new advantage of a product must be discovered in order

to support invention and it is not invention to perceive that the product which others had discovered had qualities they failed to detect. General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (1945).

■■■ A mere scientific or other explanation of processes disclosed by the prior art does not render the device to which it is applied patentable. DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339, (1931); Aetna Steel Products Corp. v. Southwest Products Co., 9th Cir., 282 F.2d 323 (1960); In re James, 83 F.2d 313, 23 CCPA, Patents, 1124 (1936). The fact that a certain beneficial effect or theory may not have been recognized in the prior art would not have controlling effect if the device or process involved was taught by the prior art. See Georgia-Pacific Plywood Co. v. United States Plywood Corp., D.C.S.D.N.Y., 148 F.Supp. 846 (1956). Nor is it invention to apply to a new use publicly available knowledge which anyone skilled in the art would be led to make. A treatment which would logically suggest itself to those expert in the art as worthy of investigation or which merely involves a final step suggested by the prior art does not involve invention. Vanadium Corp. of America v. Marzall, 91 U.S.App.D.C. 3, 197 F.2d 187 (1952). Nugey v. Oliver Manufacturing Supply Co., 3rd Cir., 321 F.2d 118 (1963); see also Consolidated Electrodynamic Corp. v. Midwestern Instruments, 10th Cir., 260 F.2d 811 (1958).

A patent relating to the treatment of deep wells, such as oil, gas, brine or water wells, to increase production and merely teaching the obvious fact that hydrochloric acid could be inhibited to prevent corrosion of metal equipment while being used to dissolve limestone rock, has been held invalid for want of invention over prior art. It was said that mere addition of water to dilute a known chemical solution is not entitled to a patent monopoly, at least unless a definite dilution point or range is discovered corresponding to a physical phenomenon and that where lack of invention is beyond doubt, this cannot be outweighed by commercial success. Dow Chemical Co. v. Halliburton Oil Well Cem. Co., 324 U.S. 320, 65 S. Ct. 647, 89 L.Ed. 973 (1945) in effect overruling Dow Chemical Co. v. William Bros. Well Treating Corp., 10th Cir., 81 F.2d 495 (1936), cert. dn'd. 298 U.S. 690, 56 S.Ct. 960, 80 L.Ed. 1408. See also Great Atlantic & Pac. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). Merely making a known element of a known combination workable by means of adjustments known to the art, where no new or unexpected result is obtained, is not "invention". Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943). Cf. Phillips Petroleum Company v. Ladd, D.C.D.C., 219 F.Supp. 366 (1963).

■■■ Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert. But in the absence of proof of some unusual or surprising consequences from the unification of elements the rather severe test involved in this field is not met. Great Atlantic & Pac. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). And commercial success, even though more spectacular than here, will not obviate the necessity of invention. Dow Chemical Co. v. Halliburton Oil Well Cem. Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973 (1945).

■■■ Each element in plaintiff's device was known to prior art and as in the last cited case there does not here seem to be any decidedly novel feature which constituted invention. Nor were the results achieved significantly novel or surprising. The results achieved as heretofore indicated were of substantial utility but as said in Dow Chemical Co. v. Halliburton Oil Well Cem. Co., supra, "He who is merely the first to utilize the existing fund of public knowledge for new

and obvious purposes must be satisfied with whatever fame, personal satisfaction or commercial success he may be able to achieve". As has been stated, it is the invention of what is new and not the attainment of comparative superiority or greater excellence in that which was already known, that amounts to patentable invention. Libbey-Owens-Ford Glass Co. v. Celanese Corporation, 6th Cir., 135 F.2d 138 (1943).

In Lyman Gun Sight Corp. v. Redfield Gun Sight Corp., 10th Cir., 87 F.2d 26 (1936), it was said:

> "Where a patent includes a combination of elements, it is not necessary to establish anticipation that all of the elements be found in a single earlier patent or in a single device previously in general use. It is enough if the evidence, taken as a whole, discloses that all of the claimed elements are found in different prior patents in the art or in different devices previously in general use, and no new functional relationship arises from their combination. Busell Trimmer Co. v. Stevens, 137 U.S. 423, 11 S.Ct. 150, 34 L.Ed. 719; Linville v. Milberger, (C.C.A.) 34 F. (2d) 386; Reflectolyte Co. v. Luminous Unit Co., (C.C.A.) 20 F.(2d) 607."

It is concluded that claims 1–6 of the patent in suit were anticipated by the prior art including prior public uses; and that any differences existing between such prior art and the subject matter of the patent would have been obvious to a person having ordinary skill in such art. The patented claims, therefore, are not believed to achieve the standard of patentability established by the provisions of 35 U.S.C.A. §§ 101–103.

The clerk is directed to enter judgment in favor of the defendants and against the plaintiffs, no cause of action. Costs will be denied in view of the benefit the defendants have sought and had from Ruth's useful method, notwithstanding that it has been found to fall short of a patentable invention.