1. "Combustion with Fluidization and After-Burning," Serial No. 817,420, filed June 1, 1959, as a continuation-in-part

51 CCPA

Application of Joseph G. WILSON, Robert F. Dutton, Terrell W. Haymes and Justin C. Dygert.

Patent Appeal No. 7029.

United States Court of Customs and Patent Appeals.

Dec. 12, 1963.

Oswald Herman Milmore, Piedmont, Cal., for appellants.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

Appealed claims 1–19 of appellants' patent application [1] were, as stated by the Board of Appeals, "rejected as being unpatentable over" certain referenc-

of appellants' application Serial No. 747,007, filed July 7, 1958 and later abandoned.

es. This rejection raises the single issue under 35 U.S.C. § 103 of the obviousness of the claimed invention.

The asserted invention with which we are here concerned relates to a process and accompanying apparatus which is employed particularly in connection with petroleum cracking in which a powdered metal oxide catalyst is used. The asserted improvement over prior processes and apparatus resides in the conservation and utilization of energy developed during the regeneration of such catalyst. During the cracking process, the catalyst loses its catalytic activity when it becomes coated with carbonaceous matter and in this condition is referred to as "spent" catalyst. In order to reuse such spent catalyst it is regenerated by burning away the carbonaceous matter. In appellants' process the spent catalyst, which is already hot as a result of its use in the cracking process, is continuously introduced into a combustion chamber or tower where air is forced upwards through it, forming a fluidized bed.[2] The carbonaceous matter combines with the oxygen in the air and is burned off the catalyst particles. The regenerated catalyst is then discharged continuously from the system at another point, and is available for reuse in the cracking process. In order to avoid excessive air compression costs as well as to control the temperature in the fluidized bed, it is necessary to limit the amount of fluidizing air introduced into the tower. This results in a supply of air which, although sufficient to burn away the carbon coating on the catalyst particles, is not sufficient to effect *complete* combustion of the carbon in the fluidized bed. The products of this incomplete combustion (hereinafter called "exhaust gas") contain carbon monoxide in addition to carbon dioxide and nitrogen. The concentrations of the various components in this exhaust gas are such that the gas is incapable of self-sustained, normal burning when diluted with supplemental air (i. e., the exhaust gas will not burn without either heating, as with a flame, or adding fuel, or introducing an oxidation promoting catalyst).

Appellants propose by their invention to recover a maximum amount of the energy remaining in this exhaust gas and to convert it to productive use in their process. To this end they first clean the exhaust gas and remove any entrained catalyst particles by means of separators. The clean exhaust gas is then mixed with supplemental air and heated to cause combustion of the carbon monoxide. The resulting heat energy is removed from the combustion gases by heat exchange in a waste-heat boiler. The gas is then discharged from the boiler through one or more turbines, and the power thereby generated in the turbines is used to drive compressors which in turn supply the system with both the original fluidizing air and the subsequent supplemental air. Appellants state that this increased efficiency in energy recovery makes their system self-sustaining with respect to air compression requirements.[3]

The essence of appellants' claimed invention appears to be their discovery of a method whereby both the mechanical and the chemical energy of the exhaust gas are recovered, thereby increasing

2. As appellants state at page 4 of their brief, "a fluidized bed is a confined bed of solids of powdery size through which air ascends, causing the particles to be separated and undergo rapid motions; the bed has a defined upper surface and acts as a quasi-liquid, and exerts a hydrostatic pressure."

3. It is clear that, in using the term "self-sustaining as regards compression requirements," appellants are not asserting that their invention transcends the First Law of Thermodynamics, or that they have found some magical way to increase the enthalpy of their system. They are merely stating that the most beneficial feature of their invention is that they are able to recover enough of the energy produced in burning away the carbonaceous matter from the spent catalyst to satisfy the compressed air requirements of their process.

the efficiency and economy of the regeneration process.

The references relied upon by the examiner are as follows:

| | | |
|---|---|---|
| Janicki | 1,052,588 | Feb. 11, 1913 |
| Tyson | 2,384,356 | Sept. 4, 1945 |
| Holmes | 2,559,623 | July 10, 1951 |
| Sedille et al. | 2,592,749 | Apr. 15, 1952 |
| Campbell et al. | 2,853,455 | Sept. 23, 1958 |
| British Patent | 675,583 | July 16, 1952 |

The examiner stated in his answer that claims 1–3, 7–12 and 15–19 were rejected as unpatentable over Campbell et al. in view of Tyson and Sedille et al. or the British Patent. Claims 4 and 13 were rejected as unpatentable over the above combination of references when taken further with Janicki, while claims 5, 6 and 14 were rejected on the first combination when taken further with Holmes. Section 103 requires that we first determine the differences between the subject matter sought to be patented and the prior art, and then decide whether these differences are such that, as a matter of law, the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art of regenerating spent cracking catalyst by a fluidized-bed combustion process.

The following summary sets forth what we deem to be the essential disclosures of the references. The features which we believe to differ significantly from appellants' claimed invention (in its most narrow form) are italicized:

"1. Campbell et al. discloses a fluidized-bed type of catalyst regeneration system, wherein supplemental air *and additional fuel* are added to the exhaust gas, and the mixture is burned in a boiler. *The steam from the boiler is then passed through the regeneration tower, where it is superheated.* The resulting superheated steam is then used to drive a steam turbine. *No attempt is made to recover the mechanical energy of the exhaust gas.*

"2. Tyson discloses a catalyst regeneration system *which operates without fluidization. Complete combustion occurs in the catalyst bed so that the exhaust gas contains no carbon monoxide. Fuel is added to the exhaust gas and burned to remove the excess oxygen* and the hot gas passes through waste-heat boilers and then drives a turbine-compressor set which supplies air to the regeneration tower. *The system is not self-sustaining with respect to compression requirements.*

"3. The British Patent discloses a *power plant* in which *pulverized coal* is fed into a gas-producing chamber and is gasified by the addition of compressed air. The resulting gas is then cleaned, mixed with additional air and burned in a combustion chamber. The combustion products are used to drive a turbine which in turn may drive a generator or a compressor. Steam generated *in cooling jackets* located at various places in the system is used to drive a steam turbine which in turn drives a generator.

"4. Sedille et al. discloses a *power plant* very similar to that shown in the British Patent.

"5. Janicki discloses a *hydrocarbon power generator* with pressure venting means designed to control the power output of a turbine.

"6. Holmes discloses a *turbo-supercharger system* with pressure venting means for controlling the rate of delivery of air to a burner from a compressor."

With these differences in mind, we must now consider the legal question of whether appellants' claimed subject matter as a whole would have been

obvious to one of ordinary skill in this art at the time appellants made their invention.

Claim 1 is not limited to the catalyst regeneration process which we have described, but instead is more broadly directed to a "process which comprises the incomplete combustion of fuel within a closed fluidization-combustion zone." [4] We agree with the board that the scope of this language is broad enough to include the type of power plant disclosed by the British Patent (and similarly, by Sedille et al.). In their brief, appellants point out the differences between claim 1 and the disclosures of Campbell et al. and Tyson, and argue that these differences are such that the subject matter of claim 1 would not have been obvious. They dismiss the disclosures of the British Patent and Sedille et al. as "non-analogous art," since they are not closely related to the art of regenerating spent cracking catalyst. This argument fails to recognize, however, that claim 1 does not specifically relate to that art; indeed, the process defined therein may be used in a whole range of applications, including power plants such as those shown in the British Patent and Sedille et al. There are but two substantial differences between the process described in claim 1 and that shown in the British Patent: 1) The British Patent is concerned with gasification of low-grade fuel in a fluidized bed, while claim 1 involves incomplete combustion in a fluidized bed. 2) The British Patent teaches recovery of the chemical energy (heat) of the exhaust gas only incidentally to the process of cooling various parts of the system. These differences are so slight that we think the invention as defined in claim 1, the asserted essence of which lies in the utilization, in a power plant, of both the mechanical and chemical energy of the fuel gas, would have been obvious to one of ordinary skill in the art.

Process claims 2, 3, 7 and 8 are all dependent upon claim 1 and define various modifications thereof. For example, claim 8 specifies the use of an oxidation catalyst and claim 7 calls for the burning of auxiliary fuel as alternative methods for bringing the exhaust gas to oxidizing conditions in the boiler. Claim 10 defines the apparatus necessary to perform the process described in the earlier claims and claims 11, 12 and 15–19 define various modifications of that apparatus. For example, claim 12 calls for a second compressor-turbine set (to supply the supplemental air) in addition to the single set in claim 10 (which supplies only the fluidizing air). We have carefully considered all the various modifications and details set forth in these claims and it is our opinion that the subject matter of these claims would have been obvious in view of the slight differences between the claimed subject matter and the prior art.

Claims 4 and 13 describe pressure venting means located between the boiler and the turbine which cause the turbine to operate at constant output power. Likewise, claims 5, 6 and 14 describe pressure venting means located between the compressor and the regeneration tower which control the amount of fluidizing air which enters the system. We can perceive no substantial differences between these modifications and the comparable devices disclosed by Janicki and Holmes, and we therefore agree with the board that the subject matter described in these claims would have been obvious.

Claim 9, however, is much more narrowly drawn, and requires a fresh analysis. It reads as follows:

"9. In the process of regenerating spent finely divided metal oxide cracking catalyst bearing carbonaceous deposits, wherein said spent catalyst is continuously admit-

---

4. Among the examples listed by appellants in their specification as possible applications of their process are 1) the burning of fly ash which is produced when powdered coal is consumed in a furnace and which still contains oxidizable fuel, 2) the burning of finely-subdivided coke, and 3) the burning of limestone which is admixed with coal, soot or coke for the production of lime.

ted into a closed fluidization-combustion zone, fluidizing-combustion air is continuously flowed upwardly through said catalyst to form a fluidized bed, said carbonaceous deposits are burned to produce an exit gas which is discharged from the top of said bed and contains entrained catalyst, carbon dioxide and carbon monoxide, said exit gas being incapable of self-sustained combustion at the exit temperature when mixed with supplemental air, and regenerated catalyst is continuously discharged from said zone, the improvement of recovering heat and work energy from said exit gas sufficient to supply the combustion and fluidization air requirements of the process by: maintaining said fluidization-combustion zone at a substantial superatmospheric pressure sufficient to permit expansion of the exit gas in a turbine, substantially separating said entrained catalyst from the exit gas by inertia without substantially lowering the exit gas temperature, mixing the clean exit gas with supplemental air, subjecting the resulting mixture to oxidizing conditions substantially at said superatmospheric pressure within a boiler having fluid-confining heat-transfer walls to cause further combustion in the clean gas with oxidation of the carbon monoxide and thereby heating said heat-transfer wall by radiation and convection, discharging the resulting combustion products from the boiler and expanding them in expansion gas turbine means and thereby generating shaft power, compressing said fluidizing-combustion air and supplemental air to said superatmospheric pressure and supplying them to the fluidization-combustion zone and the clean exit gas by using said shaft power."

With respect to this claim, we think little consideration need be given to the disclosures of the British Patent and Sedille et al. Those patents are concerned with power plants, an art which, as appellant asserts, is remote from the catalyst regeneration process of claim 9. When we evaluate the differences between the prior art and appellants' process as claimed in claim 9, we find that these references have little weight in establishing obviousness of appellants' process. Section 103 requires us to test obviousness from the viewpoint of one skilled in the art to which the subject matter of the claimed invention pertains. In the case of claim 9 that art is, broadly, fluidized-bed catalyst regeneration, and not power plants such as those with which the British Patent and Sedille et al. are concerned.

Campbell et al., although directed to a fluidized-bed type of catalyst regeneration process, does not disclose recovery of the *mechanical energy* of the exhaust gas. Tyson, on the other hand, does suggest the dual methods of energy recovery, but the gas from which the energy is recovered is very different from that found in appellants' process as claimed in claim 9. Tyson's gas is the result of *complete* combustion (i. e., all of the carbon is converted to carbon dioxide and the gas contains excess oxygen) in a *non*-fluidized system; therefore, *no carbon monoxide is present and additional fuel must be added to remove the excess oxygen* from the gas. We think these factual differences warrant the legal conclusion that it would not have been obvious for one of ordinary skill in the catalyst regeneration art to attempt the recovery of both the chemical and mechanical energy from hot exhaust gases containing amounts of carbon monoxide, where the gas is produced as the result of incomplete combustion in a fluidized bed of spent catalyst. In addition, neither Campbell et al. nor Tyson disclose a system which is self-sustaining with respect to air compression requirements. This feature is an essential advantage of appellants' invention as defined in claim 9.

For the foregoing reasons the decision of the board is affirmed with respect to claims 1–8 and 10–19, and reversed with respect to claim 9.

Modified.