William O'KEEFE, Sr., and Michael H. Mack, Plaintiffs,

v.

Edward J. BRENNER, Commissioner of Patents, Defendant.

Civ. A. No. 1041–65.

United States District Court
District of Columbia.

Sept. 14, 1966.

Almon S. Nelson, Washington, D. C., William C. Babcock, Long Beach, Cal., for plaintiffs.

Jere W. Sears, Washington, D. C., for defendant.

## OPINION

JACKSON, District Judge.

This is a civil action to obtain a patent under 35 U.S.C. § 145. Upon review of the evidence and briefs in the case, the Court finds for plaintiffs who are entitled to receive a patent for the invention set forth in Claims 12, 13 and 17 of application Serial No. 161,325, filed November 4, 1959, entitled "Water Conditioning Method and Apparatus".

Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This is an action under 35 U.S.C. § 145 in which plaintiffs seek an order authorizing defendant to issue a patent including Claims 12, 13 and 17 in application Serial No. 161,325, filed November 4, 1959, entitled "Water Conditioning Method and Apparatus". The application is a continuation-in-part of application Serial No. 598,189, filed July 16, 1956, by plaintiff, William O'Keefe, Sr., entitled "Water Conditioner".

2. The invention is concerned with treatment of water to prevent electrolytic corrosion of ferrous tubular members through which the treated water flows, remove oxygen from the water, and eliminate the deposition of scale therefrom; all without destroying the potability of the treated water. The apparatus consists of a specially configured copper pipe section inserted in an iron supply pipe, magnesium anodes disposed within the flow passages of the copper section, and having direct electrical contact therewith through threaded mounted plugs. The magnesium anodes and metallic plugs represent the anode half of a galvanic cell and the copper body and ferrous pipe to be protected the cathode part. In operation, the galvanic cell generates an electric current which counteracts an electrical force which would tend to transform elemental iron into the ionic form, thereby preventing electrolytic corrosion. At the same time, the magnesium anode dissolves in the water and forms gelatinous thixotropic suspensions with otherwise hard scale forming materials. Furthermore, the magnesium is

acted on by dissolved oxygen in the water and thereby removes the oxygen.

3. Claims 12 and 13 relate to a method of treating water to accomplish the goals of the invention, as follows:

Claim 12:

A method of treating water containing foreign material that tends to be deposited as a hard layer on a ferrous container into which said water is discharged to minimize such deposition, comprising the steps of:

(a) discharging said water through at least one elongate passage that is at least partially defined by a first surface of a magnesium-containing material and a second surface of a copper containing material, with said first surface being of such area relative to the rate of flow of said water through said passage that sufficient magnesium is dissolved therein to substantially reduce the oxygen content of said water and forms gelatinous thixotropic suspensions with said foreign material therein to the extent that said foreign material is not deposited as a hard layer in said container;

(b) maintaining said materials defining said first and second surfaces in electrical conducting engagement; and

(c) maintaining said material defining said second surface in electrical conducting engagement with said ferrous container with a minimum of electrical resistance to provide an electrical potential between said first surface and said second surface, together with the interior surface of said ferrous container that is sufficient to prevent electrolytic corrosion of the interior surface of said ferrous container.

Claim 13:

A method as defined in Claim 12 which includes the further step of maintaining the area of said second surface sufficiently large relative to the area of said first surface that such polarization as may occur during flow of water between said surfaces will not be sufficiently great as to lower the electromotive potential between said first surface and the combined surfaces of said second surface and the interior surface of said container to the extent that electromotive corrosion will take place on the interior surface of said container.

4. Claim 17 defines an apparatus used for attaining the desired results, as follows:

Claim 17:

A device for concurrently protecting an iron surface against corrosion and treating water without destroying the potability thereof after said water flows from a first tubular member, including:

(a) a second tubular member of iron in which the interior thereof defines said iron surface;

(b) a hollow copper body, the exterior surface of which is exposed to the ambient atmopshere, said body having a water inlet, a water outlet, and an opening formed therein, which body serves the dual function of a cathode and a connection through which water can flow from said first to said second tubular member;

(c) means for connecting one end of said first tubular member to said water inlet to permit water to discharge from said first tubular member into the interior of said body;

(d) means for connecting one end of said tubular member to said water outlet with metal-to-metal contact to permit said second tubular member to receive water from the interior of said body;

(e) a magnesium anode disposed in a fixed position within said body, which anode is shorter in length than the interior thereof and is spaced from the interior surface of said body to permit unobstructed flow of water through said body from said inlet to said outlet; and

(f) a metal cover that removably engages said opening with metal-to-

metal contact and grips said anode in metal-to-metal contact at a single section thereof to expose at least one end surface and substantially all of the side surfaces of said anode to water flowing through said body, said cover supporting said anode in said fixed position, with said cover and anode being adapted to be separated as a unit from said body for anode replenishing purposes while said body remains connected to said first and second tubular members, which anode when so supported in said fixed position, together with said cover and body, cooperatively define a galvanic cell from which an electric current flows directly to said second tubular member to maintain said iron surface at a sufficiently high voltage that it does not corrode due to transformation of said iron into the ionic state, with said magnesium going into solution as said water flows through said body to said second tubular member to reduce the oxygen content of said water and increase the hydroxyl ion content thereof to form gelatinous thixotropic suspensions with any foreign materials in said water, which suspensions tend to so remain and not be deposited as scale in said second tubular member.

5. The Examiner and Board of Appeals relied upon the following two prior United States patents in rejecting the claims in question as being obvious under 35 U.S.C. § 103:

| | | |
|---|---|---|
| Butler | Pat. No. 2,524,511 | October 3, 1950 |
| Lattner | Pat. No. 2,358,981 | September 26, 1944 |

6. The Butler patent discloses placing a galvanic cell in a closed water circulating system. This prevents scale formation and also removes oxygen from the treated water. There is no resultant inhibition of electrolytic corrosion.

7. The Lattner patent also uses a galvanic cell to treat water. The passage through which the water is directed is defined by an outer copper cylinder and an inner zinc cylinder, both electrically connected to the iron piping and to one another. Testimony by plaintiffs' witness as to the effect of the use of Lattner's device was to the extent that flow of current would be so minimal as to have no effect upon the electrolytic corrosion of the system.

8. The testimony establishes that the invention in question is greatly superior to that of the prior art and has met with considerable commercial success. Prior to plaintiffs' invention, removal of oxygen and control of scale forming necessitated the use of expensive chemicals and daily care by skilled personnel. Use of this invention has alleviated temporary hardness of water without decreasing its potability as well as cutting down on the cost of such water treatment.

CONCLUSIONS OF LAW

1. Claims 12, 13 and 17 are patentable over the disclosures in the Butler and Lattner references.

2. The subject matter of Claims 12, 13 and 17 would not have been obvious to one of ordinary skill in the art at the time of the invention.

3. Although commercial success cannot make an otherwise clearly obvious invention patentable,[1] it is a factor to consider,[2] particularly when coupled with unexpected results.[3] In Graham v.

1. In re Cline, 345 F.2d 847, (Cust. & Pat.App.1965), Sterling Drug, Inc. v. Brenner, 256 F.Supp. 1000, (D.C.D.C. 1966), Converse v. Brenner, 259 F.Supp. 227 (D.C.D.C.1966).

2. Goodyear Tire & Rubber Co., Inc. et al. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944); California Research Corp. v. Ladd, 356 F.2d 813 (D.C.Cir.1966).

3. United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1965).

John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965), while holding the patent invalid, the Supreme Court stated:

" * * * Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or unobviousness, these inquiries may have relevancy."

thereby retaining commercial success as a factor to be considered.

4. A patent should be granted on application Serial No. 161,325, containing Claims 12, 13 and 17.