**Application of Nathan R. CLINE.**
**Patent Appeal No. 7417.**

United States Court of Customs and Patent Appeals.

June 4, 1965.

Rehearing Denied July 1, 1965.

John H. Widdowson, Wichita, Kan., for appellant.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

Nathan R. Cline appeals from a decision of the Patent Office Board of Appeals, adhered to on reconsideration, wherein the examiner's rejection of claims 10 and 11 of appellant's patent application was sustained. No claims were allowed.

Appellant's application, serial No. 768,314, filed October 20, 1958, is entitled "Fountain Pen." The claims are very descriptive of the invention; claim 10, the more detailed of the two, reads as follows:

"10. A fountain pen for instant drying writing inks comprising, in combination, an elongated pen barrel open at one end and closed at the other end, a single one piece length of substantially semi-rigid absorbent material for instant drying writing ink positioned in said barrel, said material being integrally formed and substantially cylindrical in shape and initially of length and diameter to substantially fill said pen barrel with one end portion thereof projecting from said open end of said barrel, said one end portion of said absorbent material being coaxial with the other end portion thereof and shaped at the outermost end thereof to form a fountain pen nib, said absorbent material being constructed to receive, hold and transmit therethrough an instant drying writing ink with said material comprising the only ink receiving reservoir in said pen, a collar-like holder member having a generally cylindrical and smooth inner surface, said holder member being threadedly and removably mounted inside said open end of said barrel with said absorbent material passing through and in snug engagement with said cylindrical inner surface thereof, and a single straight vent hole in said holder member extending longitudinally therethrough positioned and communicating between the interior of said barrel and the atmosphere to vent said pen and prevent pressure differential between the atmosphere and the interior of said barrel, said fountain pen being constructed and adapted to in operation receive instant drying ink in said absorbent material with same being dispensed through said outermost end of said one end portion thereof and with said vent hole eliminating pressure differential between said pen barrel and the atmosphere during use of said pen, said absorbent material being extendable from said barrel through said holder member to provide a renewable pen nib."

The absorbent material, preferably a strip of felt, constitutes the only ink storing reservoir in the pen, and the ink supply is apparently replenished by dipping the nib in a bottle or other outside source of the instant drying ink. The felt strip may be pulled out and sharpened as the nib wears down. Perhaps the most significant feature of appellant's structure is the vent hole, which is said to prevent ink leakage. According to appellant, heat from the user's hand, and other factors, cause vaporization of ink and expansion of air and ink vapor within the barrel of the pen, and the increased pressure within the barrel is often enough to force excess ink out through and around the nib. By venting the barrel to provide gaseous communication between the absorbent ink storing material and the atmosphere, appellant

asserts that the leakage problem is solved.

The pen employs quick-drying inks and is used to make relatively broad lines for writing and marking on advertising placards, shipping boxes and crates, packing cases and the like. Affidavits of record establish that pens conforming to the appealed claims have been reasonably successful in winning commercial acceptance, particularly in connection with sales to supermarkets, drug stores and similar retail outlets for use in making signs, etc.

The claims were rejected as "unpatentable over" the following references:

| | | |
|---|---|---|
| Rosenthal | 2,416,596 | Feb. 25, 1947 |
| Garvey | 1,166,896 | Jan. 4, 1916 |
| Hand | 2,140,009 | Dec. 13, 1938 |

From the tenor of the examiner's answer and the board's decisions, this rejection clearly appears to be for obviousness under 35 U.S.C. § 103, and appellant and the solicitor have so treated it.

Rosenthal discloses a fountain pen for use with very volatile inks. In general, the structure and uses of the Rosenthal pen are quite similar to appellant's with two significant differences: Rosenthal does not show venting means; and the absorbent felt material is in two sections. One section serves as a storage reservoir and feeder for the ink, while the other serves as the writing nib. Since the two felt sections must maintain physical contact for the capillary flow of ink from reservoir to nib, it is not possible to withdraw and sharpen the nib when it becomes worn. With regard to the problem of ink leakage, Rosenthal states:

" * * * Heretofore difficulty has been experienced in preventing leakage of ink through the felt, particularly when the pen is subjected to an increase in temperature or a decrease in atmospheric pressure. * *

* * * * * *

"Under ordinary conditions little or no ink tends to leave the nib when the pen is not being used. However, an increase in temperature causes the ink and air in the reservoir to expand and consequently there is a tendency for ink to be forced through the nib. Likewise a decrease in atmospheric pressure tends to cause flow of ink from within the reservoir through the nib.

* * * "

Rosenthal proposes to obviate such problems by providing air space within the barrel of the pen, to give room for expansion, and a felt filler in the cap of the pen, to absorb leakage.

Garvey discloses a fountain brush having a barrel which serves as an ink reservoir. The writing nib or "wick" is in one piece and extends into the ink reservoir. Garvey points out that "As the lower end of the wick wears away it may be readily adjusted by pulling on its extended lower portion."

Hand discloses an applicator for liquid cosmetics comprising a housing, an absorbent liquid retainer and feed strip enclosed within the housing and an integral applicator nib or head. With regard to the problem of leakage, Hand states:

"In accordance with the invention, the liquid cosmetic is carried by absorbent material enclosed within the housing * * *, and an air space is provided within the housing and is vented to the surrounding atmosphere so that upon a rise in the temperature of the device, the expansion of air in the housing cannot cause leakage of the cosmetic liquid. * *

* * * * * *

"In accordance with the invention, an air vent is provided connecting the space 15 [within the housing] with the surrounding atmosphere. * * * This arrangement permits air to escape from and enter the space 15 as the air is heated or cooled. Accordingly, the expansion of air accompanying a rise in temperature of the device cannot act to force the cosmetic liquid out of the applicator head H, and leakage of the liquid is prevented. * * *

* * * * * *

" * * * When the device is carried and used, its temperature frequently increases. This temperature rise makes no appreciable change in the volume of the cosmetic liquid, but expands the air within the housing to a considerable extent. The expanding air finds a ready avenue of escape through the air space and vent openings described and the expulsion of liquid from the absorbent mass by air expansion is thus avoided."

■ It was the view of the examiner, sustained by the board in a well considered opinion, that the appealed claims were obvious in view of the prior art, specifically Rosenthal in view of Hand and Garvey. We agree. Garvey clearly shows the desirability of a unitary strip of absorbent material which may be pulled out and sharpened as the nib wears down, and we agree that it would have been obvious to a person of ordinary skill in this art that such a unitary strip could be used to advantage in the basic Rosenthal pen structure.

As for the problem of ink leakage, Rosenthal clearly recognized the problem and its probable cause, and Hand discloses a workable solution to the same problem in a slightly different context. We think it would have been obvious to employ venting means of the type disclosed by Hand in the basic Rosenthal pen structure. We are not persuaded by appellant's argument that Hand involves "non-analogous" art. Hand seeks to apply liquid cosmetics without leakage; appellant seeks to apply ink. The subject matter is sufficiently analogous that Hand's teachings may not be ignored. Compare In re Menough, 323 F.2d 1011, 51 CCPA 741, 745 with In re Wilson, 325 F.2d 243, 51 CCPA 819, 823.

The record contains a letter to one Sidney Rosenthal (the patentee of the Rosenthal reference) in which appellant commented:

"I have been thinking of experimenting using a small drill and making vents or breather holes along side the felt in some of these nibs. Has that been tried? Perhaps the aluminum wall of the nib could be made a bit thicker and several vent holes then put in the wall inself [sic: itself] instead of in or along side the felt."

Rosenthal replied as follows:

"Don't try to put holes along the felt wall, because you will only increase the flooding in the Brushpen and, in addition, create a drying-out factor. * * * "

Appellant urges that Rosenthal's doubt as to the efficacy of providing vent holes shows that the idea was unobvious.

While we feel that Rosenthal's statement, coming as it does from a man undoubtedly skilled in the art, is competent evidence and tends to show that the venting concept was unobvious to at least one such person, we do not think that such evidence overbalances the clear teaching of Hand that venting is indeed a satisfactory solution to the leakage problem. Cf. In re Weber, 341 F.2d 143, 52 CCPA 1015; In re Luvisi, 342 F.2d 102, 52 CCPA 1063.

■ We have also considered appellant's proofs of commercial success. The record shows that the dollar volume sales of a pen corresponding to the claims have increased approximately twelve-fold over the period 1958 to 1963, from less than $20,000 to about $250,000 annually. While a showing of commercial success attributable to the novel features of an applicant's invention tends, in every case, to show that the claimed subject matter was unobvious, see In re Hammell, 337 F.2d 654, 52 CCPA 810, likewise in every case such a showing must be weighed in the balance with all the other evidence in the record, pro and con. We have so proceeded in the instant case and have concluded that appellant's claimed invention would have been obvious, notwithstanding a certain degree of commercial success. Commercial success cannot make an otherwise clearly obvious invention patentable.

The appealed decision is affirmed.

Affirmed.